6, Medici's Pharma v. Ocella Pharma. Mr. McNichol, you may proceed. Thank you, Your Honor. Please, the court. Medicine appeals from the decision of the district court because the district court made several legal errors that caused it to ignore material questions of fact that should have precluded summary judgment. Medici's scientists and vendors were able to solve a problem that had vexed the dermatological drug delivery art for decades going back at least to the 1950s. And this made it possible for Medici's to produce an invention, a product that had properties that were markedly different than the prior art properties. And that new property, which was the solution to the problem of insoluble particles getting trapped into the fabric of a cloth or a pad so that it could be released to the skin, was the difference between the prior art and the claimed invention that the district court said it didn't see was material to the obviousness analysis, accepting, apparently, the argument that Ocella made below and makes here, which is that properties of an invention that are not explicitly recited in the claims are not material to the obviousness inquiry. Is the trapped particle problem enunciated in any particular prior art reference, or is it only identified in your experts' disclosures? It is mentioned both in the patent itself and in the testimony of Mr. Bogartis, the expert. But none of the prior art references expressly recognize any sort of trapped particle problem. The prior art recognized it, but the references relied upon by the district court. Nothing in this case. Nothing, no. Other than the patent itself. And the testimony of Mr. Bogartis, who actually was the person in charge of formulating some of the prior art that is in the record. He was the person in charge of the R&D team that developed Clearzone. And he testified that he and his colleagues who developed Clearzone, he's also testified as to his awareness of his competitors making products such as Stridex and others over the years. Back in the 1980s, when I would have probably used it. When we all have gone through that time, Your Honor. But in the summary judgment record, Mr. Bogartis testified that the invention, which he said was using a combination of a liquid vehicle in the form of an emulsion, having a certain viscosity, and particles of a certain size. The invention of the 355 patent keeps the particles from being trapped in the pad, and that's in the opinion. So I made a joke about timing, relevant to myself. I was really actually suggesting something about your case. Isn't his testimony really from his knowledge of the state of the art in the 1980s? That's not correct. No? Certainly, just because he had knowledge that went back that far doesn't mean that his knowledge stopped at that point. And in fact, in the summary judgment record, Mr. Bogartis testified after making not only a recollection of his own familiarity and his own experience, but also after a review of the prior art, and also testifying as to his general familiarity with the art. But I think Judge Moore's point is that his activity, with respect to the fact that he testifies that, well, I, along with others, didn't come to this conclusion, or didn't move to this formulation, that does solely relate to his activities in the 80s, does it not? No, it does not. Mr. Bogartis testified that all of, and this is in the appendix in 1804, that even though all of these separate clues, referring to the elements of the prior art, or elements of the invention, were available to us, none of us could figure out a way to combine them as the Metis inventors did. And Mr. Bogartis testified that the invention made by the Metis inventors was, in fact, a breakthrough. I think that fairly has to be read, or at least the fact finder would have to be given the opportunity to read it as saying that Mr. Bogartis was aware that there had been no solution to that problem to that date. But at the end of that paragraph, he concludes, if it were obvious, we would have developed such a system in the 1980s. That paragraph seems to me to be referring generally to the state of the art during his tenure as a formulation scientist, right? If between the 80s and the 2000s somebody else had already, and Mr. Bogartis is still active and testified that he was still active, somebody else had already done it, then it wouldn't be a breakthrough. In my view, there is no novelty question here. Well, I take it that the three references that certainly cradle has, I guess, everything except the particle size. Is that fair to say? I don't believe Parole included a pad. I may be mistaken. OK. All right. Smith includes the pad and the container and BPO and describes the emollient as moist but not sticky, but doesn't give a specific scent of moist, right? Smith, there are deficiencies. The deficiencies with Smith are, first, Smith is a two-pad system. It puts the benzyl peroxide particles not in an emulsion, but in a gel. So if you were to look at Smith's column. Wait, Smith discloses the BPO in an emulsion expressly? If you go to column 12, line 23, that speaks of a gel. When it uses the word emollient, is that not an emollient? No, an emollient is not the same word and it is not the same thing. And there's never been any testimony in the record that it says there's an identity between the two. An emollient is a technical matter. And again, the record is correct. Well, at 10.23, it refers to an emollient emulsion? Yes, but at 10.23, it refers to an emollient emulsion? It seems to reside in emulsion. At column, if I could, bear with me while I get to 10.19, for example, it describes it as a gel. Aqueous emollient peroxide containing gels. A gel is a single-phase semisolid and an emulsion is a two-phase system. If we go to column 15, line 41, again, it refers to an aqueous non-emollient gel. But a gel is a gel, not an emulsion. It is a single-phase semisolid. What do you say about column 20, lines 29 through 36? I'm sorry, is column 20 lines? Column 20 lines 29 through 36 with specific reference to line 31. There are two pads in Smith, and so there's two components put on two different pads. The benzyl peroxide is put in the gel. The other components are put in an emulsion. And the figures in Smith show very clearly the fact that you have two different pads. And Smith, for his own purposes, keeps different things in different pads. Well, but it seems to me, and I read this as a rank amateur approaching this technology, but it seems to me that what that paragraph is saying is that at the end of the day, the pads are moist, but not sticky or unduly wet. And they apply, talking about what pads collectively do, they apply a clear, non-sticky, homogeneous film of the emollient emulsion to dry skin surface. That sounds like what they're saying is an emulsion that contains this anti-infectant is put on the skin. Well, again, I won't belabor the distinction between emollient and emulsion. They are not the same words. They don't have the same meaning. But Smith is missing. It's not an anticipatory reference. Well, I think everybody agrees. So the question then becomes how we would interpret this and whether Smith would be combined with Krull, Tarasov, or any of the others. And there was direct testimony on that point from Mr. Bogardas, whose qualifications to address that point are sterling. And he laid out his analysis of why he thought there was no motivation, reason, suggestion to combine those references to reach the evasion of the 355 patent. That testimony will have to be evaluated by the fact finder. It will be credited as fact finder sees fit. And that will happen at trial, not a summary judgment. And the district court actually acknowledged that there was that kind of a conflict in the record between the testimony of the experts and the evidence put forward by the parties. And the district court skipped over that by making two mistakes. First, it said I don't have to look at the properties of the invention unless they're specifically recited in the claim. And second, the court said, now that I've simplified away everything that's new, I can just look at this through the eyes of a layperson. To make sure that we have all. So they said, I'm going to ignore that evidentiary conflict on that very material point. To make sure we have all the components of the obviousness analysis in place and we agree as to what they do say, I take it that you would not disagree that Priel recites the viscosity range that encompasses, or at least overlaps, the claimed range. It overlaps. It overlaps. And that Harasoff recites the particle size that overlaps the claimed range, right? It overlaps. OK. There's never been any doubt that you can look through various prior art references and find the separate elements of the claim. So the motivation to combine a question that is a pure question of fact and one that this court, for example, in WIRES has said is crucially dependent on an expert testimony in areas that are outside the scope of ordinary layperson's experience, the district court said there was a conflict in the evidence. And that conflict has to be resolved in the fact finder. You are into your rebuttal time. Would you like to keep going, or? Unless the court has some questions, I'd be happy to reserve that time. To reserve the rest of your time. Mr. Harris? May it please the court. Your Honors, I think the key issue is, where did this trapped particle problem come from? And what does it mean in the context of this case? When you read the claim language, there is no reference to particle entrapment or particle delivery. When you read the claim construction, there is no reference to particle entrapment or particle delivery. When you read the specification, the patent refers to, in claim one, an emulsion vehicle for dermatologically active ingredients, wherein the composition has a viscosity which is low enough for the composition to substantially uniformly absorb onto the pad by a capillary action, and high enough to be substantially retained on the pad, not the container. This absorption retention issue is what the claims are addressed to. The specification in columns one and two talk about this absorption retention issue. The specification in column two at lines, I guess it would be eight to 13, talk about creams and lotions hold the dermatologically active ingredients in suspension fairly well, resulting in even distributions of the dermatologically active ingredient throughout the vehicle, and thus on the skin. So is it your position that to the extent that the trapped particle problem is solved at all, that that is merely an unexpected result that goes to secondary considerations or objective indicia only? That is part A, Your Honor. Absolutely correct. This issue does not go to the other factors that you consider in determining obviousness. It doesn't go to the scope of the claims. It doesn't go to the prior art. And it doesn't go to the person of ordinary skill in the art. It only goes to secondary consideration. But more than that, here we're talking about multiple problems. There is this problem of adhering to the pad, not running off, and not being left on the container. And it's clear that the claims are addressing that problem. There's also an issue with suspensions that's identified at the top of column two, where it says, I'm sorry, it begins on the last line of column one. To make matters worse, having filtered or adsorbed the dermatologically active ingredient out of suspension, such pads have a tendency to retain the dermatologically active ingredient and not release it to the skin. I think a fair reading is that that is the particle entrapment problem. But it's not even talking about emulsion. It's talking about suspension. Going on in column two, when it is talking about creams, which is one form of emulsion, at line 19 to 21, it says, often the cream is incompletely released from the pad, resulting in an under-application of the dermatologically active ingredient. If anything, I guess that's a cream entrapment problem. Problem number three, the particles are in the cream. When you look at this in terms of secondary considerations of obviousness, you have to ask, how is the unexpected result linked to the scope of the claim? What is the nexus between the claim that has been issued in this patent? Why, in your view, is it limited to use in secondary considerations? Why is that relevant to the motivation to make the combination? If everyone knows there's a problem when you add two chemicals together, then when you have a claim that adds those chemicals together, people might be dissuaded from doing that. I mean, that's what they argue here. They say, look, people wouldn't take this particle size and this viscosity because of the trapped particle problem. Whether you agree or not, that's what they claim. So why isn't that relevant to whether one of Scaliart would be motivated to put those items together? First, it has to be in the record. There is nothing in the record teaching away from an emulsion. Their expert testified in his deposition that the solution to the trapped particle problem was to use an emulsion. That is A2409. Question, is there anything in the 355 patent that minimizes the risk of mechanical entrapment? Yes. What is it that minimizes that risk? By properly suspending them in the emulsion. When I asked on the previous page, is the particle size of 50 microns or less, that is the preferred particle size of the 355 patent, advantageous in part because it reduces the likelihood of mechanical entrapment? Answer, no. So we do not have the three elements of the claims in the 355 patent of viscosity in a certain range, a particle of a certain size, and an emulsion. We do not have those three elements combining to solve the trapped particle problem by the admission of their own expert. The entrapment problem is solved by the use of an emulsion alone, which was known. Now, it is not stated in those prior art references that the emulsion solves a trapped particle problem. That is not stated. But on the other hand, there is no reference in this record that says you do not use an emulsion to solve a trapped particle problem. It teaches away from it. There is nothing in the record that taught away from it. And I think it is very informative to look at the case. You do not think the expert testimony teaches away from using the emulsion? No, I think the expert, by his own admission, says the emulsion is exactly the mechanism and the only mechanism that solves that entrapment problem. But I also think it is important to look at KSR versus Teleflex on this issue, the issue of what motivates the combination. Well, you would agree that to the extent that the trial court said that the commercial success was what motivated the combination, that that was erroneous. Wouldn't you agree with that? Well, I do not think that the court said commercial success motivated it. The court said that the desire to use a pad, that that was a desirable delivery mechanism, was part of the motivation. But it was also desirable to solve this problem of adhering to the pad, not being left in the container, so that when you take the cloth out of the pad, there is product available to apply to the face or whatever part of your body you're applying it to. And in KSR, on page 1742, the court says, the first error of the Court of Appeals in this case was to foreclose this reasoning by holding that courts and patent examiners should look only to the problem the patentee was trying to solve. The Court of Appeals failed to recognize that the problem motivating the patentee may be only one of many addressed by the patent's subject matter. The question is not whether the combination was obvious to the patentee, but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. The desire to have an emulsion that is absorbed and retained by the pad is a problem identified in this patent. It is a problem that motivated the combination of Smith and Pruhl, because Smith and Pruhl both talk about using a non-sticky emulsion.  the combination of Smith and Pruhl without regard to the trapped particle problem. Where do you think the PTO went wrong in re-exam? Because they considered these references and have come to a different conclusion, despite even providing, I don't know if you all provided it, but someone provided to them even the district court opinion in this case, and they still came to a different conclusion. So where did they go wrong? Well, I think there are two issues, Your Honor. One is. Because theirs was even a lesser burden, too, on top of it. Correct, Your Honor. I think there are two issues, which I can't solve. One of them is systemic, and that is it's an ex parte proceeding, and I didn't get a chance to explain my side. The other problem. You've elected the ex parte, so you can't whine about not getting a chance, because there is an inter-parte opportunity, and you could have elected that instead. There may be plenty of blame to go around, Your Honor, but you asked me where I think they went wrong or why they went wrong. One reason they went wrong is they only heard from a very fine advocate, Mr. McNichol. They did not hear from me. And the discussion of trapped particle is not in the context that the district court had. The district court had a claim construction proceeding where the trapped particle problem was not discussed. The district court had briefing on a preliminary injunction, which ultimately didn't go forward, but the trapped particle problem was not discussed. The district court had a motion for summary judgment on which lengthy briefs were filed, and the trapped particle problem was discussed in two sentences. And that's a very different context from the way it was presented to the Patent and Trademark Office examiner. I don't know what analysis he went through. I don't know what priority he looked at. But he did not follow the teaching of KSR, which says that any known problem in the field of endeavor can be adequate to motivate the combination. And the combination, first of all, I think the combination is not required to avoid the trapped particle problem by the admission of their own expert. Also something that I don't think the trademark or patent examiner had in front of him, and something that the district court judge did. But second, the issue here is, what about these other problems that motivate the combination? I totally understand your argument. But before you move away, let me ask you, one of the things I thought you might say the PTO did wrong and you didn't. And I guess what I want to know is, am I wrong to even be thinking this? Because you seem like a very honest person, so you'll tell me. The prior art, the PTO said expressly that the prior art recognized a trapped particle problem. Yet it cited no particular prior art. And none of the references it had before it, as far as I'm concerned, said anything about the trapped particle problem. And Mr. McNichol was likewise honest and sort of said, well, none of the prior art of record there. But elsewhere, the prior art does. And so I guess, do you think it was an error? Do you think one of the errors the PTO made was to suggest that the prior art discloses this problem at all? I would have to say that because I believe the trapped particle problem is discussed in the specification, I don't think it was error to say, well, let's talk about the trapped particle problem for a minute. I have not, because it was not within the scope of my engagement, I have not looked at all of the prior art that was presented to the examiner. So I cannot opine to you whether there was anything about the trapped particle issue in there. I have looked at all the prior art that was presented to the district court. And the trapped particle problem is discussed nowhere but in the specification. And the problem is, there was never even agreement as to exactly what, in the specification, that trapped particle problem is. I acknowledge that there's a trapped particle problem when it's in the solution. I don't think there is a trapped particle problem when it's in an emulsion. Let's go to your friend's argument that, in fact, there was direct conflict in the expert testimony with respect to the motivation to combine. That they say that their expert says that there was no motivation to combine the different references. And, in fact, he would have done it had he had the opportunity to do so or had noticed any motivation, because he would have wanted to have the same success. How do you respond to that? Well, several things. First, in the record, we point out that the work he did was with regard to Clearasil in 1983 to 1986. The Smith patent was not filed until 1992. The Pruill patent was not filed until 1996. So he could not have had the benefit of the teaching of those references at the time he was working on Clearasil. So, number one. Well, we asked him about that. And he said that the testimony actually was broader than just his work on Clearasil. Yes, I did hear Mr. McNichol say that. I respectfully disagree. I think a fair reading talks about, I tried to do this at Clearasil, and I couldn't. And I know Stridex was a competitor. And I know they didn't either. And that's why I characterize the testimony of Mr. Bogardus as conclusory. He does not describe what he did.  He does not describe what he did not to do what he did not to do. He does not describe what others did. He simply says, I didn't do it. That's a conclusory statement that this court has said again and again is not sufficient to raise an issue to defeat summary judgment. And TSR said the same thing. I apologize for exceeding my time. Thank you, Mr. Harris. Mr. McNichol, you have some rebuttal time. Thank you, Your Honor. It's worth keeping in mind, again, that we're not here to make the ultimate decision as to whether or not these claims are or are not defining obvious or non-obvious subject matter. Simply whether there was a material question of fact, it needs to be laid before the fact finder. I mean, we can make that decision if, in fact, we find that there were no material issues. Correct. But we're here to decide whether there are such questions. Mr. Harris said that he thought that a fair reading of the patent or a reference was the following. Well, if that's the reading that he and his experts care to propose, and we and our experts propose another fair reading, then at this stage, we're entitled to the inference that our reading is correct. That presupposes that they're both fair, though, right? I mean, one's fair and one's just not reasonable. We're happy. The court is here not to make any determination in that field, except with the very lightest of touch. The fact finder's province is to make that determination initially. Mr. Bogartas's qualifications are sterling. His analysis, as detailed in his declaration testimony, was with a review of not only the patent, its file, but also its file, and each of the references cited by a cell in this case. And he testified on the basis of all that. So it would be difficult to simply say that his testimony is so spurious that we shouldn't even let a fact finder look at it. Another important thing to make sure we're aware of here is that our opponent is trying to confuse or inadvertently confuse the infringement analysis, which requires that the accused product have each of the elements of the claim, with the broader factual field on which the obviousness inquiry operates. This court's cases are very clear on that. Finally, I think the last point to be made is that Mr. Bogartas's testimony was with respect to the content of the references, not just the references. Mr. Bogartas testified that all of the tools, OK, it was his phrase, to describe the cited choir art were known to him and his competitors back in the 80s. And he said that in 1804 at paragraph 26. So it doesn't matter if somebody years later comes up with another document that reports the same information. Well, but that doesn't make sense. If all the tools were known in the 1980s, then Mr. Smith, the Prelow, the Tarasova, and the Gruber patents are all invalid because they each added elements that are within these claims. First of all, not all of them dealt with, in any way, pads. So right off the bat, the ones that don't deal with pads don't confront this problem and would never have to deal with that. So I disagree with that characterization. And Mr. Bogartas has testified that Smith, OK, was not the first to solve, they didn't, therefore, the trapped particle problem. Smith, as I pointed out, used a gel, an emollient, not being the same as an emulsion. That's essentially Jell-O. He suspended the particles in Jell-O. And so no, I don't agree with the characterization that those patents are somehow invalid or their validity is in question. Their inventions go off in different directions. Do you have a final thought? Your time has expired. If you'd like a final sentence. I thank the court for its time. I think that, again, there is more than enough evidence in this record to create a head-on fact question that has to be laid before the fact finder. And we'll be happy to meet Acela on that ground in the district court. We thank both counsels for their argument. The case is submitted.